CASE 73—PROSECUTION AGAINST LON FUQUA FOR MURDER.—JUNE 18.

# Fuqua v. Commonwealth.

APPEAL FROM M'CRACKEN CIRCUITCOURT—W. M. REED, CIRCUIT JUDGE.

DEFENDANT CONVICTED AND APPEALS.    AFFIRMED.

HOMICIDE—CROSS EXAMINATION OF WITNESS—TERMINATION OF EX-
AMINATION BY COURT—REMARKS OF COURT—EVIDENCE—READING
TESTIMONY OF DECEASED WITNESS—DYING DECLARATIONS.

1. Civ. Code Prac., sec. 593, provides that the court shall exer-
cise reasonable control over the examination of witnesses, so as
to make it as little annoying to the witness and as effective as
may be, but that, subject to such control parties may put such
legal and pertinent questions as they may see fit. HELD, that
the discretion conferred will not be interfered with on appeal,
unless abuse is manifest.
2. In view of the statute it was not error for the trial court to
stop cross-examination with the remark that he believed the
cross-examination had gone far enough, it appearing that the
question which caused the interruption was relative to a matter
which had been fully brought out.
3. It was improper for the trial court, on terminating the cross-ex-
amination of a witness, to state that it was "immaterial any
way."
4. Ky. St. 1903, sec. 4643, declares that the testimony of any wit-
ness taken by the stenographic reporter shall constitute a part
of the record, and may be used on a subsequent trial where the
testimony of such witness can not be procured, save that in
criminal cases such testimony shall be so used only on consent of
defendant. HELD, that the statute does not apply to a witness who
is dead, and hence on a criminal prosecution it was proper to per-
mit the stenographer who took down the testimony of a deceased
witness on a former trial to read such testimony in evidence.
5. The fact that decedent had suffered from a wound necessarily
mortal, was so weak that he could hardly move in bed, could
speak audibly with exceeding difficulty, and stated that he be-
lieved he was going to die, and that the doctor had told him so,
rendered his declarations admissible as dying ones.
6. A writing containing a statement which had not been signed by
decedent, or read over to him, or in any way recognized by him

Fuqua v. Commonwealth.

after it was written, was not admissible as his dying declaration.

7. Where, on a prosecution for murder, a writing was not admissible as the dying declaration of accused because of the fact that it had not been signed by him or recognized by him after it was written, the fact that a witness testifying to the dying declaration, and who wrote the statement, and the Commonwealth's attorney, once or twice incidentally referred to the paper as the "dying declaration," was not prejudicial.

THOMAS E. MOSS, ATTORNEY FOR APPELLANT.

(The brief of appellant's attorney is not in the record, and the reporter inserts the following from appellant's petition for rehearing.)

1. The mere presence of a party at the commission of a homicide is not sufficient to constitute him a principal; there must be something shown in his conduct which unmistakably evinces a design to encourage, incite, approve, or in some manner afford aid. Neither is a bystander responsible, even though he takes part in acts connected with it, if the killing does not result therefrom and there is no preconcert between him and the slayer. Connaughty v. State, 1 Wis., 159; Jordan v. State, 79 Ala., 9; Frank v. State, 27 Ala., 37; Thorp v. State, 13 Lea (Tenn.), 138.

2. To convict one charged as an accomplice in a murder, it must be shown beyond a reasonable doubt that he was present feloniously and maliciously aiding and abetting the killing. State v. Brown, 36 Atl., 458.

3. It was prejudicial error in the court to allow the stenographic report of the evidence of the witness, Davis given on the former trial, to be read on this trial without the defendant's consent although the witness was dead.

N. B. HAYS, ATTORNEY-GENERAL AND LORAINE MIX, ATTORNEYS FOR APPELLEE.

1. We submit that even if the evidence of the witness, Davis given on the former trial and read from the stenographer's report (the witness having died), was inadmissible, which we do not admit, it was only cumulative and did not prejudice the defendant.

2. It is clearly shown that the dying declarations of deceased were made under a sense of impending death, and there can be no question of their admissibility.

3. The action of the court in stopping a long, tedious and ir-

relevant cross-examination was not improper, and his remark that it was immaterial had reference to statements of a witness that had no connection whatever with the case, and could not have prejudiced the defendant.

OPINION OF THE COURT BY JUDGE SETTLE—AFFIRMING.

This is an appeal from the judgment of the McCracken circuit court, entered upon the verdict of a jury finding the appellant, Lon Fuqua, guilty of the murder of George Gray, and fixing his punishment at confinement in the penitentiary for life.    The indictment in the case charged Spot Polk and appellant with the murder; the former as principal, and the latter as aider and abettor.    Separate trials were had, resulting in the same verdict as to each defendant. Appellant obained in this court a reversal of the judgment of conviction upon the first trial (see Fuqua v. Commonwealth, 73 S. W., 782, 24 Ky. Law Rep., 2205), and this appeal is from the second judgment of conviction.

The following statement of facts will serve to illustrate the manner of the homicide and the appellant's connection therewith:    On the night of Sunday, December 19, 1901, the appellant, Spot Polk, Ida Gray, George Gray, the victim of the homicide, and others, were at the house of Fordy Simpkins, in the city of Paducah.    George Gray left the company, and went to the house of Sidney Hawkins.    After he left, Polk claimed to have discovered that he had lost $10, was told by Ida Gray, who, though of the same name, was not related to George Gray, that the latter had stolen or taken it.    Thereupon Polk, in company with appellant, left the Simpkins house in search of George Gray, first going to the house of George's sister, whom they found in bed, and by whom they were informed that George Gray was not in the house.    Not satisfied of the truth of her statement, Polk entered, and searched the house for George Gray, but,

failing to find him, remarked to appellant, Fuqua, who was in hiding behind a tree in the yard, "He is not here." The two then left, and went together to the house of Sidney Hawkins, where they found George Gray, who was at once accused by Polk of stealing his money. Gray said, "What money?" and Polk replied, "'Lon (meaning appellant) said you had my money." Gray said, "Lon is a liar; I have not got your money." He then put on his shoes and said he would go with them, and prove that he did not get Polk's money. Thereupon he, Polk, and appellant returned to the home of the Simpkins woman. Upon reaching the house of the Simpkins woman, Polk presented a pistol at Gray, saying, "Give me my money." Gray said, "I didn't get your money; you can shoot me if you wish." Gray then said to appellant, "Did you say I got that money?" Appellant replied, "I said I believed it;" and, further, "Ida said you got it." Gray applied an opprobrious epithet to appellant, who said, "If you say that again I will hit you." The epithet was repeated by Gray, and appellant then struck him. Gray returned the blow, went out of the house, and got some bricks, which he started to throw at appellant, but was persuaded not to do so. Later George Gray left the Simpkins house, and did not return. Appellant and Polk remained there all night, and on the morning following (Monday) both were drunk. They left the house of the Simpkins woman that morning, and while walking near Bennett's saloon met the wife of Polk, who besought him to go home with her, but appellant urged him not to do so, but to enter Bennett's saloon. They did go to the saloon, upon entering which they saw George Gray sitting in the back room on a log near the stove. Gray, addressing Polk, at once said, "Hello, Spot." Appellant, according to the testimony of Gray, taken later as a dying declaration, said,

"Shoot the son of a bitch." Polk said nothing, but pulled out his pistol and began to shoot at Gray. Two shots were fired by him at Gray in the saloon, one of which took effect in Gray's back near the right lung. He ran out of the saloon, and was pursued by Polk accompanied by appellant. Two more shots were fired at Gray by Polk as he fled down the street, and after this last shot was fired appellant took the pistol of Polk, removed the empty shells, and the two went away together. About twenty minutes after the shooting, appellant, in reply to an inquiry from the wife of Polk as to the cause of the shooting, said: "The son of a bitch stole $10 from Spot. If he had rather die than give it up, let him die."

The evidence introduced by the appellant—especially his own testimony—was in many respects contradictory of that of the Commonwealth. But a careful examination of the record will, we think, show the facts of the homicide to be in substance as above stated. In view of the facts, criticism of the verdict of the jury would, in our opinion, be unwarranted. Thirteen grounds for a new trial were filed by appellant in the court below. But we will consider only such of them as are urged in the brief of counsel for a reversal.

It is insisted for appellant that the lower court, by interrupting the cross-examination of the first witness when introduced, and in saying, "I think this cross-examination has gone far enough; it is immaterial, anyway," erred to the prejudice of appellant. An examination of the entire testimony of the witness in question will show that the cross-examination was searching and exhaustive. The question which seemed to have caused the interruption by the court was in regard to a matter which had been fully brought out. The information it sought had been freely testified to, in view

of which the question was, we think, unnecessary; but it can hardly be said that it was in relation to a matter that was immaterial. We think it was not error for the court to rule that the cross-examination on that point had gone far enough. But we question the propriety of the after-declaration of the court to the effect that the question was immaterial. A trial court should always be careful not to give expression to views not intended for or proper to be heard by the jury, as ordinarily his word goes further with them than anything that may be said by counsel. Much depends upon the manner of making a statement. A thing that is harmless in itself may be made harmful by the manner in which it is staed. We are, however, unable to find in this instance anything in the record that leads us to believe that the statement upon the part of the court, of which complaint is made, was prejudicial to the appellant. Section 593, Civ. Code Prac., which is also applicable to trials in criminal cases, provides that "'the court shall exercise a reasonable control over the mode of interrogation, so as to make it rapid, distinct, as little annoying to the witness and as effective for the extraction of truth as may be; but, subject to this control, the parties may put such legal and pertinent questions as they may see fit. . . . The discretion conferred upon trial courts by the section *supra* is broad, and should not be interfered with by a court of revisory power unless its abuse is made manifest. Dean v. Commonwealth, 78 S. W., 1112, 25 Ky. Law Rep., 1876.

It is also contended that the court erred in permitting the stenographic report of the evidence of William Davis to be read to the jury. This contention is based upon section 4643, Ky. St., 1903, which is as follows: "The testimony of any witness or witnesses taken by said (stenographic) reporter in any court, or decision as aforesaid,

shall constitute a part of the record of the case and may
in the discretion of the presiding judge, be used in any
subsequent trial of the same case, between the same parties,
where the testimony of such witness or witnesses can not
be procured, which fact must be made to appear satisfactor-
ily to the court by affidavit of the party desiring to use the
same, or his attorney: provided that in criminal cases such
testimony shall be so used only upon the consent of the de-
fendant." We are of opinion that the section of the statutes
*supra* was not intended to apply, and does not apply, to a
witness who is dead when his testimony taken by the official
stenographer on a former trial is offered to be used as evi-
dence in a subsequent trial of the same case between the
same parties, but that it applies alone to the testimony of
living witnesses so taken, and offered to be used, and whose
presence and oral testimony can not be procured for use
in the subsequent trial. It is admitted that the witness
Wm. Davis testified in the first trial of appellant, and that
he died before the second and last trial. It appears from
the sworn statements of the stenographic reporter that the
testimony of Davis, the reading of which is complained of,
was correctly taken down by him stenographically at the
first trial of appellant, and afterwards transcribed upon a
typewriter, and that the testimony thus taken was duly
certified by him officially, and made a part of the record
of the first trial of appellant. Why, then, should it not have
been read as evidence upon the trial of appellant? It has
long been the law that in a subsequent trial of the same case
between the same parties it is competent to prove or repro-
duce by the oral statements of others the testimony upon a
formal trial of one whose death occurred after the giving
of such testimony and before the subsequent trial. Thomas
v. Commonwealth, 20 S. W., 226, 14 Ky. Law Rep., 288;

Walkup v. Commonwealth. 20 S. W., 221, 14 Ky. Law Rep., 337. The reason of the law for recognizing the admissibility of the testimony of a witness since deceased is that it was given under the solemnity of an oath, and with an opportunity for cross-examination. In Rice on Evidence, section 224, it is said: "The evidence of a witness, since deceased, on a former trial of the same case, may be proven on a subsequent trial. His deposition then taken may be introduced either by the State or by the accused. Such proof does not violate defendant's constitutional right to 'meet the witness face to face.' And his testimony then given may be proved, if necessary, by the testimony of one who was present and heard it, who may state its substance, if unable to state its words. The fact that a witness on such previous trial, who is still living, is absent from the State, or beyond the territorial jurisdiction of the court, is not generally ground for the admission of his previous testimony. . . ." Where the witness is deceased, the authorities hold, in uniform accord, that proof of his testimony upon a second trial is admissible. This rule is bottomed upon necessity, and its aim is to prevent the defeat of justice. Upon the other hand, to admit proof of the testimony of an absent living witness given upon a former trial would be to dignify secondary evidence, and to disregard that provision of the Constitution which guaranties to the defendant the right to be confronted by the witnesses. Hence the necessity for the enactment of the statute, which makes the transcript of the stenographer's report admissible as evidence in a civil action, under certain conditions, to prove the testimony of an absent living witness, made in a previous trial in the same case and between the same parties; such evidence not to be used, however, in a criminal case, except with the consent of the defendant.

The only feature of this question that remains to be considered is as to the admissibility of the transcript of the official stenographer which was used in this case. As the stenographer, if familiar with the testimony given by Davis at the previous trial, might, from mere recollection, have detailed it to the jury, we know of no reason why he should not have been permitted to read it from the transcript made from the stenographic notes taken by him at the time Davis testified. Manifestly, it was and is more accurate than the memory of any human witness who may have heard Davis testify. On this subject we are not without authority. In Rice on Evidence, p. 355, we find this statement of the law: "What a witness, since dead, has sworn upon a trial between the same parties, may be given in evidence either from the judge's notes or from notes that have been taken by any other person who will swear to their accuracy; or the former evidence may be proved by any person who will swear from his memory to its having been given." It will do no violence to the appellant's rights to hold that the transcript of Davis' testimony read to the jury was competent evidence, and we so hold.

It is also contended by counsel for appellant that the trial court erred in admitting proof of the dying statement of George Gray. It is sufficient to say that this court on the former appeal held, and we now hold, that the statements of Gray which were admitted in evidence as dying declarations were competent. The evidence clearly shows they were made in *extremis* and when the declarant had no hope or expectation of recovery, but believed that his dissolution was at hand. But it was also held on the former appeal, and we now hold, that the paper purporting to contain the dying declaration of Gray could not be read to the jury, as it was not read to or signed by him, but that the wit-

Fuqua v. Commonwealth.

nesses who heard what was said by the deceased on that subject might testify in regard thereto, and that the witness who wrote down the words might refresh his recollection by a reference to the memorandum made by him in testifying to what was said on that subject by the deceased. We gather from the record that the opinion of this court was adhered to by the trial court; that the paper referred to was simply used by Cross, who wrote it, to refresh his recollection; and we do not think that the fact that Cross or the Commonwealth's attorney once or twice incidentally referred to the paper as the dying declaration of Gray, though such references do not appear of record, was prejudicial to the appellant. Nor can we see that any part of the testimony of Cross was incompetent.

The instructions seem to be proper in all respects. At any rate, there is no criticism of them to be found in the able and admirably written brief of counsel.

We are unable to find in the record any ground of reversal, wherefore the judgment is affirmed.

Petition for rehearing by appellant overruled.